# In the United States Court of Federal Claims

No. 10-560 C
(Released for Publication: November 3, 2010)

```
************************************
                                    *
EREH PHASE I LLC                    *
                                    *     Post-Award Bid Protest; Lease of Office
                Plaintiff,          *     Space; Base Realignment and Closure
                                    *     Act (BRAC); Flood Plain; Presidential
        v.                          *     Executive Order 11988; GSA Floodplain
                                    *     Management Desk Guide; FEMA Flood
THE UNITED STATES,                  *     Insurance Rate Map; Rentable Square
                                    *     Feet; Usable Square Feet; ANSI/BOMA
                Defendant,          *     Office Area (ABOA) Square Feet;
        and                         *     Occupancy Schedule; Certificate of
                                    *     Occupancy; Progressive Occupancy;
GBA ASSOCIATES LIMITED              *     Criteria for Injunctive Relief; Interest of
PARTNERSHIP,                        *     the Public; Bid Preparation Costs
                                    *
                Intervenor-Defendant *
                                    *
************************************
```

*Michael A. Hordell*, Pepper Hamilton LLP, Washington, DC, with whom were *Michael R. Golden*, *Stanley R. Soya*, and *Heather Kilgore Weiner*, for Plaintiff

*Patryk J. Drescher*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, with whom were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Donald E. Kinner*, Assistant Director; and *Edith Toms*, Deputy Regional Counsel, and *Jeffrey Dunn*, Assistant Regional Counsel, General Services Administration, Washington, DC, for Defendant

*Marcia G. Madsen*, Mayer Brown LLP, Washington, DC, with whom were *David F. Dowd*, *Luke Levasseur*, *Roger D. Waldron*, and *Polly A. Myers*, for Intervenor-Defendant

# **OPINION AND ORDER**[1]

DAMICH, Judge:

Before the court are cross motions for judgment on the administrative record (AR) in a post-award bid protest of the award of a contract by the General Services Administration (GSA) for the lease of office and related space. Plaintiff complains that the award of the lease to GBA Associates Limited Partnership (GBA) was made in violation of material terms of the Solicitation for Offers (SFO) and that the lease award should instead be awarded by the court to Plaintiff.

For the reasons stated below, the court finds that the award of the lease to GBA violated the provision of the SFO that no award shall be made for a property located in a flood plain and that the decision of GSA in this respect was arbitrary and capricious. The court does not find, however, any violations of the SFO, as further alleged by Plaintiff, with respect to GBA's offer of the amount of rentable square feet (rsf) or its schedule for the delivery of completed space.

Nevertheless, because the public's interest weighs heavily against an award of injunctive relief, the court DENIES Plaintiff's motion and GRANTS the cross motions of Defendant and Intervenor.

I.   Background

On January 20, 2010, GSA issued Solicitation for Offers No. 9VA2175 (SFO or Solicitation) for the award of a contract, GS-11B-02213, to lease office space. AR 331. There were five subsequent amendments to the SFO. AR 311-16. GSA retained CB Richard Ellis (CBRE or broker) as its construction project management expert to assist in the procurement. AR 342, 2695; Def.'s Cross Mot. for J. on AR 21.

The purpose of the solicitation was to obtain office space sufficient to enable the location of the Department of Defense Medical Command (MedCom) headquarters in one centralized site in the Northern Virginia area, pursuant to the Base Realignment and Closure Act (BRAC). AR 235, 89. MedCom's BRAC realignment and relocation must be complete by September 15, 2011. AR 3849, 3836.

GSA received offers from three bidders: EREH Phase I LLC (EREH), GBA Associates Limited Partnership (GBA), and Vornado. AR 2697. Vornado filed a protest with the Government Accountability Office (GAO) against the SFO's BRAC mandated occupancy date of June 1, 2011. AR 2698. That protest was denied. *Id.* Vornado's offer was found non-compliant and it was eliminated from the competition, leaving only EREH and GBA under consideration in the final evaluation. AR 2698, 1593. The EREH site is also referred to in the record as "Victory Center – 5001 Eisenhower Ave., Alexandria, VA;" The GBA site is also referred to as "Raytheon Building – 7700 Arlington Blvd., Falls Church, VA." AR 2696.

---

[1] This opinion was originally issued under seal on October 28, 2010, pending a determination among the parties whether to propose redactions of proprietary or other confidential information. The parties have advised the court that they have no redactions to propose.

The SFO provided that the lease would be awarded to "the lowest responsible Offeror whose offer conforms to the requirements of this SFO and is the lowest priced offer submitted." AR 240.

Subsequent to the receipt of initial offers, GSA held negotiation meetings and discussions with the offerors. AR 2695-2705. On April 23, 2010, GSA sent letters to EREH and to GBA noting various deficiencies and items requiring clarification in their offers, respectively, and requested final proposal revisions (FPRs) by May 6, 2010. AR 2682, 1597.

Based on the FPRs, GSA calculated the net present value of the respective offers. It determined that GBA's offer was $27.59 per ABOA square foot and that EREH's offer was $32.16 per ABOA square foot. AR 2707; Def.'s Cross Mot. for J. on AR 7. GBA's offer was thus the lowest-priced offer and met the requirements of the solicitation. AR 2708. On June 24, 2010, GSA notified GBA that it was the apparent successful offeror and that it would be recommended for lease award. AR 2829. The lease was executed with GBA as of July 12, 2010. AR 2839.

On July 19, 2010, EREH filed a bid protest with GAO, but that protest was dismissed on August 18, 2010, when EREH filed its protest in this court.

On August 20, 2010, the court denied Plaintiff's motion for a temporary restraining order and preliminary injunction against the GBA lease award. The court issued a scheduling order for briefing on opposing motions for judgment on the AR.[2] Briefing concluded on September 20, 2010, and the court heard oral argument on September 29, 2010.

II. Jurisdiction, Standing, and Standard of Review

The Court of Federal Claims has jurisdiction under the Tucker Act to render judgment in actions by an interested party challenging the award of a contract in connection with a procurement. 28 U.S.C. § 1491(b)(1). There is no dispute among the parties about the court's jurisdiction over this matter and the court finds that its jurisdiction is manifest. For purposes of standing, the Federal Circuit has defined an "interested party" as "an actual or prospective bidder[] or offeror[] whose direct economic interest would be affected by the award of the contract or the failure to award the contract." *American Fed'n of Gov't Employees Local 1482 v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001). As an actual offeror and the only final

---

[2] The relevant filings in the case docket are: 1) Verified Complaint for Declaratory Judgment, Temporary Restraining Order and Preliminary and Permanent Injunctive Relief ("Pl.'s Compl. for Relief"); 2) Plaintiff's Motion to Supplement the Administrative Record ("Pl.'s Mot. to Suppl."); 3) Plaintiff's Amended Motion for Judgment on the Administrative Record ("Pl.'s Mot. for J."); 4) Defendant's Cross Motion for Judgment Upon the Administrative Record and Opposition to Plaintiff's Motion for Judgment Upon the Administrative Record ("Def.'s Cross-Mot."); 5) Intervenor-Defendant's Response to Plaintiff's Motion for Judgment on the Administrative Record and Cross-Motion for Judgment on the Administrative Record ("Intervenor's Cross-Mot."); 6) Plaintiff's Response to Defendant's Cross-Motion for Judgment on the Administrative Record and Intervenor-Defendant's Cross-Motion for Judgment on the Administrative Record ("Pl.'s Resp."); 7) Intervenor-Defendant's Reply to Plaintiff's Response to Intervenor-Defendant's Cross-Motion for Judgment on the Administrative Record ("Intervenor's Reply"); and 8) Defendant's Reply to Plaintiff's Response to Defendant's Motion for Judgment Upon the Administrative Record and Defendant's Opposition to Plaintiff's Motion for Judgment Upon the Administrative Record ("Def.'s Reply").

offeror other than GBA, EREH has clearly met the requirements for standing to pursue this action.

The court's review of the agency's decision in a bid protest is limited. In concordance with the scope of review under the Administrative Procedure Act (APA), this court reviews the record to determine whether the decision of the agency is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2); *Impresa Construzioni Geom. Demonico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). The court may set aside a contract award if the agency decision lacked a rational basis or the procurement procedure involved a violation or regulation or procedure. *Id.* "Accordingly, the test for reviewing courts is to determine whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" *Id.* at 1332-33. The burden of showing that the award decision had no rational basis is a heavy one. *Id.* at 1333. Even so, "[A] proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations." *Centech Group, Inc. v. United States*, 554 F.3d 1029, 1038 (Fed. Cir. 2009).

Once the trial court determines that the award lacked a rational basis or was contrary to law, the court may award relief to the protester only where it is demonstrated that the protester was prejudiced by the decision of the agency. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005). Such prejudice requires showing that there was a substantial chance that the protester would have received the contract award. *Labatt Food Service, Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009); *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996) ("Thus, for Statistica to prevail it must establish not only some significant error in the procurement process, but also that there was a substantial chance it would have received the contract award but for that error.").

   III.   Flood Plain

The first and most salient ground upon which Plaintiff challenges the award of the contract to GBA is its allegation that GBA's property is located within a flood plain[3] in contravention of the SFO.

The SFO provides, in ¶ 1.7, that "[a]n award of contract will not be made for a property located within a base flood plain or wetland unless the Government has determined that there is no practicable alternative." AR 173.

The flood plain restriction is derived from Presidential Executive Order 11988, issued on May 24, 1977. AR 3597. GSA incorporated this directive in its Floodplain Management Desk Guide. AR 3819. The Desk Guide provides that "EO 11988 and this Floodplain Management Desk Guide apply to any GSA activity which involves acquisition (by purchase or lease) or disposal of Federal lands and public buildings . . ." AR 3821. It further explains that "EO 11988 directs GSA and other Federal agencies to avoid floodplains unless it is determined that there is

---

[3] The flood plain in question is the Holmes Run flood plain in Fairfax County, Virginia. Pl.'s Mot. for J. on AR 8.

no practicable alternative" and notes that "[t]he easiest way to comply with the Executive Order is to ensure that the 'Solicitation for Offer' (SFO) first considers properties outside the floodplain." *Id.* The Desk Guide then prescribes "Eight Steps of Floodplain Compliance," the first of which is, "Determine whether the action will occur in, or stimulate development in, a floodplain." AR 3822.

A. What Constitutes the GBA "Property" that is Subject to the SFO Restriction?

GBA offered a 44-acre parcel of land with three contiguous buildings, located at "7700 Arlington Boulevard" in Fairfax County. AR 3053. It described its parcel, "situated on approximately 44 secured acres inside the Beltway," as "an integrated campus of prime office space." *Id.* Both the Government and GBA acknowledge that a part of the parcel, in which some parking spaces, an access road, a security station, and a part of the security fence are located, is within a flood plain. AR 2537; Tr. 36:7-10, 69:4-6, 72:16-19, 88:20-22 (Def.).[4]

In order to avoid possible disqualification of the GBA parcel under the SFO because part of it is in a flood plain, Defendant argues that "the proposed action" of the SFO "was the lease of office space, not a parcel of land." Def.'s Cross-Mot. 14. "Our position is that the Executive Order speaks to proposed action and the proposed action at issue here is a lease of the building and some parking spaces." Tr. 15:19-22 (Def.). "The solicitation at issue here did not contain any specific acreage requirements and there are no allegations by EREH that any substantial or material portion of the site is in a flood plain." Def.'s Cross-Mot. 16. GBA makes a parallel point. It argues that "[t]he relevant inquiry concerns the 'property' to be leased by GSA, not what the lessor owns." Intervenor's Cross-Mot. 15. It avers flatly that "GBA did not offer to lease 44 acres to the Government." *Id.* at 16. Furthermore, it argues that "[t]he Solicitation does not define 'property' as separate and distinct from the space that GSA will pay for and occupy." *Id.* at 15.

The court finds GBA's position – that it did not offer its 44-acre parcel in response to the SFO – to be untenable. Its own "Project Narrative" speaks of "a controlled perimeter . . . maintained by a continuous fence line around the property that will channel vehicles to the designated site entry points." AR 3056. It also advises that the property includes a private access road that will allow for security screening of vehicles in a controlled manner. *Id.* The GBA site map provided in its offer, on which GSA relied in part for its determination that the building itself was not in the flood plain, shows not only the building and proposed parking spaces but also the access road, proposed security station, and parcel boundaries. AR 2537. In addition, the "U.S. Government Lease for Real Property," dated July 12, 2010, that GSA and GBA signed, pursuant to its award, references the premises of the building and parking spaces "with their appurtenances" and includes as Exhibit C ("attached and made a part hereof") a site plan that shows the full parcel of land. AR 2839-43, AR 2893.

Furthermore, although Plaintiff made no reference to these documents in its briefs or at oral argument, the AR includes copies of Fairfax County real estate tax bills for the GBA property at 7700 Arlington Boulevard, Falls Church, VA 22042. AR 2531-36. These tax bills

---

[4] References to oral argument on the cross-motions for judgment on the AR, held Sept. 29, 2010, are made in the format of page:line (party).

5

reference three separate, although contiguous, parcels that together comprise the entire site, "PCL A," "PCL B," and "PCL C." Preceding these real estate tax bills in the AR are two pages, marked with GSA and Department of Defense logos, that provide the "Legal Description" of each of the three parcels. "Parcel A" is described, inter alia, as "containing 20.000 acres of land, more or less." AR 2528. "Parcel B" is described, inter alia, as "containing 13.000 acres of land, more or less." AR 2529. "Parcel C" is described, inter alia, as "containing 10.631 acres of land, more or less." The total acreage of the three parcels – 43.631 acres, more or less – corresponds to the 44 acres described in GBA's own Project Narrative.[5]

Significantly, the SFO provides, in sections 3.4 and 4.2, that the Lease rental rate would be inclusive of real estate taxes. AR 183, 188; *see also* 1599. Thus, the fact that the Fairfax County real estate taxes applicable to GBA's offer are based on the approximately 44 acres of GBA's entire parcel undermines the position of both Defendant and Intervenor that the court should focus solely on references in the SFO to the lease of the building.

As to the question, then, whether the reference to "property" in the SFO paragraph which asserts the flood plain restriction means only the building and parking spaces or the full parcel of land, the Government is correct in noting that the operative language of the Executive Order itself concerns "actions" proposed in a flood plain, AR 3597-99, and that the principal focus of the SFO is the lease of requisite office building space. See SFO ¶ 1.1 at AR 172. The court notes, however, that, when referring to the "location" of real property, one of the recognized meanings of the term "property" extends to the parcel of land, not just portions of the parcel. *See* Black's Law Dictionary 1252 (8th ed. 2004) ("Any external thing over which the rights of possession, use, and enjoyment are exercised <the airport is city property>."). GBA's offer, as demonstrated by its detailed map, included *use* of the parcel of land located at 7700 Arlington Boulevard for appurtenances such as parking spaces, perimeter fencing, access roads, and a security station. These appurtenances may also fairly be considered "development." If such development occurs within the Holmes Run flood plain, it would thus contravene one of the policy considerations in the Executive Order that underlies the requirement to determine flood plain compliance under Step One of the GSA Desk Guide.

Furthermore, the SFO specifically uses the term "building" when it refers to requirements pertinent just to the building itself. By contrast, in ¶ 1.2, subtitled "Unique Requirements," regarding security standards, the SFO directs that "[t]he offered building and/or *location* must have the following features: A. *Site* and improvements must meet all DoD anti-terrorism Standards . . ." AR 172 (emphases added). The distinctions drawn between the building, on the one hand, and the location or site, on the other, clearly signify that the "actions" under the SFO encompassed more than just the lease of a building (and parking). Accordingly, the specific use of the term "property" rather than "building" in ¶ 1.7 strongly suggests that a broader construction of the flood plain restriction is warranted.

---

[5] Page 2528 of the AR also includes a rough map of the boundaries of the three parcels with a notation within each parcel of the "Map #" that corresponds to the "Map Reference Number[s]" on the Fairfax County Real Estate Tax Bills.

For all these reasons, the court finds that the property in question as to which the SFO flood plain restriction applies, is the full 44-acre site described in the narrative overview of GBA's offer.

B. Is GBA's Property in the Flood Plain?

The next inquiry, accordingly, is whether GBA's property is within the flood plain. GSA's Desk Guide explains that Step One of flood plain compliance requires "[r]eview [of] a Flood Insurance Rate Map (FIRM) for the area. AR 3822. Flood insurance rate maps are produced by the Federal Emergency Management Agency (FEMA). AR 3719. GSA reviewed the latest FIRM for the Holmes Run flood plain, which dates to 1990. AR 2724. That map shows the boundaries of the flood plain but does not show the boundaries, overlapping or not, of any of the surroundings properties. As part of its determination that the GBA property was not located within the flood plain, GSA also produced or relied upon the same 1990 FEMA map with a hand-drawing of an irregular, slightly rectangular plot of land roughly where the GBA parcel of land lies currently and a blackened circle within it suggestive of the rough location of the GBA building. AR 2725. There is no record of who authored the hand-drawing or when, nor is there any indication that it is drawn to scale (and every indication that it is not). The boundary of the hand-drawn parcel of land appears to approach or touch, but not overlap, the edge of the FEMA map's boundary of the flood plain. In comparison with GBA's engineered drawing of its site, it is clear that the blackened circle within the hand-drawing does not comport with the actual location of the GBA building vis-à-vis the flood plain.[6]

GBA's own engineered site map, AR 2537, demonstrates that the flood plain boundary crosses at least a portion of the southwest side of the GBA parcel of land. See Tr. 33:14 – 36: 21 (Def.).[7] Both GBA and Defendant dispute the significance of this acknowledgement, citing a 2003 decision of the Government Accountability Agency (GAO) in *Ronald W. Brown*, B-292646, 2003 CPD ¶170, 2003 WL 22242497 (Comp. Gen., Sept. 30, 2003). In *Brown*, a losing bidder protested an award by GSA of a contract to lease space on the grounds that the awardee's property was located within the 100-year flood plain in violation of the solicitation with a provision the same as at issue here. The protest was denied, because the solicitation was not a lease for "a parcel of land" but rather just for rentable square feet and on-site parking spaces. Even though a small part of the land on which the office space was located fell within the flood plain, the larger portion of the land which incorporated the building and the parking spaces did not. "Since the contract is for the lease of building and parking space, which are not in the flood plain, and there is no argument that the flood plain will interfere with the agency's use of the

---

[6] It is notable to the court that GSA would acknowledge having relied to any extent on the FEMA map with the hand-drawing in reaching its determination on GBA's flood plain compliance. Any reliance on that map's crude rendition of the parcel's boundaries suggests that the parcel's boundaries, not just the building's placement, were relevant to the compliance determination. If the building's precise location in relation to the flood plain was the pertinent inquiry – and given that the blackened circle was manifestly imprecise – that map would have had no probative value at all. Yet it is included in the Administrative Record as one of the documents that GSA relied upon in its determination. If "property" in the SFO restriction meant "building and parking," then the hand-drawing, such as it is, would have focused on those particular elements of GBA's offer.

[7] The court recognizes, of course, that both GSA and GBA mistakenly construed the flood plain restriction contained in SFO ¶ 1.7 as applying only to the building and parking spaces.

leased space, we think GSA reasonably determined that the awardee's offer was acceptable." *Id.* at *2. *Brown* is neither binding on this court, nor persuasive based on its facts. There, the flood plain crossed only "a peripheral part of the land on which the offered space is located," neither the awardee's building nor parking spaces fell within the flood plain at all, and there was no evidence that the flood plain would otherwise "interfere" with the agency's use of the leased space. *Id.* Here, in a lease with significant security implications and requirements,[8] within the flood plain lie not only a number of parking spaces incorporated in the GBA offer[9] but the vehicle security station and portions of the access road and perimeter security fencing as well.

The court finds that GBA's property does cross over the boundary of the flood plain.

C. Was the GSA Flood Plain Determination Rationally Based?

Finally, the Government argues that the real question for the court is not the technical accuracy of the flood plain's boundaries or "better ways of doing things," but rather, "Was the [GSA] decision rational?" Tr. 49:18 – 50:6 (Def.). Plaintiff maintains that an analysis similar to that described in FEMA's "Flood Insurance Rate Map Tutorial" ("FEMA Tutorial) (admitted by this court as a supplement to the AR) is required in order to perform the flood plain determination required in Step One of the Desk Guide. *See* Pl.'s Mot. to Suppl., Exh. 4. Defendant responds that the Desk Guide "simply require[s] GSA to consult and review the FEMA maps." Def.'s Reply 4.

Even the GSA "Floodplain Mapping Technical Guide," referenced in Step One (which Defendant attached to its Reply, but which is not a part of the AR) only advises that GSA "*may use* mapping and determination services . . . *as needed*" to make accurate determinations. *See* Exh. 1, p. 2, to Def.'s Reply (emphases added). Accordingly, Defendant concludes,

> The documents in the administrative record, including the drawing, unequivocally demonstrate that GSA followed the required procedures – it consulted and reviewed the FEMA FIRM map to determine that the proposed action was not in a floodplain and it

---

[8] As to the appurtenances such as the perimeter security fence and the security station, ¶ 1.2 of the SFO requires that the "offered building and/or location" must meet "all DoD anti-Terrorism Standards," including a perimeter and building "standoff" and that parking and roadways within the perimeter must also meet a minimum standoff. AR 172. Section 10.0 of the SFO, titled "Lease Security Standards," further provides in ¶ 10.1 that certain security standards will be based on the "configuration of the site and lot" and in ¶ 10.13 that the government required security control over public areas and building entry points, "including adjacent surface parking." AR 223. Pursuant to ¶ 10.17, the government also required "the right to divert truck shipments to a secondary location for screening purposes." *Id.*

[9] "Our position is that currently some[thing] less than 50, approximately 45, of the parking spaces are in the floodplain currently." Tr. 18:15-17 (GBA). Defendant and Intervenor rightfully point out, however, that the number of parking spaces offered by GBA exceeds by several hundred the number required under the SFO. They argue, therefore, that the fact that a small number of such spaces fall within the flood plain is both harmless and curable. Nevertheless, it cannot be gainsaid that the GBA "offer" as submitted included "property" within the flood plain. According to the Desk Guide, Step Two mandates GSA to "identify and evaluate practicable alternatives to locating in or affecting the floodplain," AR 3822, a step GSA did not pursue. Tr. 59:20 – 62:4 (Def.).

> placed information about that process in the project file. Based upon GSA's review of the FEMA map, comparison to GBA's submitted site plan, and a Google aerial map of the site, GSA rationally concluded that the proposed action was not within a floodplain.

Def.'s Reply 6-7.

The court is not convinced, however, that GSA's decision was based on an informed analysis of the flood plain question. Setting aside GSA's reliance on GBA's own engineering drawing of the site, AR 2537, the AR is devoid of any analysis by GSA itself other than that GSA reviewed four documents and relied on an objectively self-serving exchange of emails, AR 2727, in which the outside experts retained by GSA unquestioningly accepted assurances from the outside experts retained by GBA that "*the building*" was not "*technically*" within a flood plain (emphases added). The four documents, none of which the court finds adequate to a rational decision, are: 1) the 1990 FEMA FIRM, AR 2724; 2) the 1990 FEMA FIRM with the hand-drawing, AR 2725; 3) the Google aerial map, AR 2726; and 4) the 2007 Epic Consulting "Phase I Environmental Assessment," AR 3494. The starting point is the requirement in Step One of the Desk Guide that GSA must "[r]eview a Flood Insurance Rate Map (FIRM") for the area." AR 3822. The relevant FIRM is the 1990 FEMA map.

It is evident even to a layman that the 1990 FEMA FIRM, in the absence of any overlay of a plat map of contiguous properties, conveys nothing useful to a determination of the Holmes Run flood plain vis-à-vis the GBA property. Regardless of whether the FEMA Tutorial itself lays out the required methodology essential to the "review" specified in Step One, there is no doubt that something quite along those lines (showing comparable dimensions, base flood elevations, etc.) is implicated. Otherwise "review" would be an empty term.

Of similar, vacuous utility is the 1990 FEMA FIRM with the hand-drawing. It provides no further useful information because there is no indication that the drawing is to scale (and every indication that it is decidedly *not* to scale) and the drawing cites neither authorship nor any information as to when or why it was rendered. On the other hand, the Google aerial map shows the existing GBA building, but no observer can rationally apprise the precise boundary of the flood plain by simply "eye-balling" a picture of the area. The Epic Consulting assessment is the most professional of the four documents that GSA relied on, but it is circular in its conclusion, relying in turn solely on the aforementioned 1990 FEMA FIRM. It cites, without evident support, that the 1990 FEMA FIRM "lists the property in Unshaded Flood Zone X, defined as areas determined to be outside the 500-year floodplain." AR 3494. The 1990 FEMA FIRM does indeed show a section of the area marked as "Zone X," but, as already stated, the map does not show any actual properties relative to the flood plain boundary or to the boundary of "Zone X." The court does not find that accepting the unsupported "say-so" of the Epic assessment rises to the level of a rational "determination" which is required by GSA's own Desk Guide.

The email exchange is also insufficient to a rational determination by GSA. On the evening of June 28, 2010, CBRE, GSA's expert, wrote to GBA's expert, Cushman Wakefield, as follows:

9

> It appears that 7700 Arlington Blvd. is very close to a flood plain. Can you please confirm that the building is not technically within a flood plain[?]

The answer received less than an hour later was, in full:

> Confirmed.

AR 2727. On June 30, GBA signed the "U.S. Government Lease for Real Property," which was presumably then signed by GSA and dated July 12, 2010. AR 2839. The court also notes that the question put to Cushman Wakefield was with respect to the building specifically, not the entire site. This email exchange serves only to demonstrate that GSA relied on GBA's representation, but does not contribute to any finding that GSA made its own determination.

Thus, the only document in the AR that shows both the alleged flood plain boundary with a scaled overlay of the GBA site, including the building, the parking spaces, and the rest of the GBA parcel, is the map prepared for GBA by Urban Engineering and Associates. AR 2537. Even this map, however, shows that at least a portion of the GBA parcel lies within the flood plain. Furthermore, the court finds arbitrary and capricious a GSA determination that rationally relies only upon the submission of the bidder.

The court finds in conclusion that the GBA property offered in response to the SFO does lie within the flood plain in material respects and that GSA's finding to the contrary was arbitrary and capricious and contrary to the requirements of the SFO.

IV. Square Footage Requirements of the SFO

The second basis for Plaintiff's protest of the award to GBA is that GBA failed to offer a required minimum amount of rentable square feet ("rsf").

In ¶ 1.1 A. of the SFO, GSA advised that it was "interested in leasing approximately 750,791 rentable square feet of space. The rentable space shall yield approximately 652,862 ANSI/BOMA Office Area (ABOA) square feet for use by tenant . . ." AR 172.[10] Per Amendment Number Two to the SFO, dated February 1, 2010, the usable square feet requirement was reduced to 625,659 ("Approximately 625,659 ANSI/BOMA office square feet are required for the entire project."). AR 312. The Amendment made no reference to any change to the SFO regarding the amount of rsf. The SFO also specified, in ¶ 1.1 C., that an "offer shall . . . be within the ABOA square footage range to be considered . . ." AR 172.

---

[10] "ANSI/BOMA Office Area" refers to space "where a tenant normally houses personnel and/or furniture." See ¶ 4.1 A.1. of the SFO. AR 188. "ANSI/BOMA Office Area (ABOA)" and "usable square feet" ("usf") are used interchangeably in the SFO. See ¶ 1.1 F. of the SFO. AR 172. The "rentable square feet" area of a building is usually greater than the "usable square feet" because the former term includes "building support, mechanical, and HVAC space, and common areas such as elevator lobbies, building corridors and restrooms." Pl.'s Compl. for Relief 8; see also ¶ 4.1 B. of the SFO, AR 188.

10

Plaintiff argues that the SFO established a minimum requirement of 750,791 rsf and that this amount was a "requirement that defined the competition." Pl.'s Resp. 19. In support, Plaintiff cites, principally, an analysis dated May 25, 2010, by GSA experts CBRE of GBA's best and final offer (BAFO), entitled "Scaling of Offered Space Contractor Statement." AR 2680. In the first column of the analysis, the "SFO *Requirement*" is stated as "750,791 RSF" (emphasis added). Plaintiff argues that "[o]nly firms with space that met this requirement could submit an offer." Pl.'s Resp. 19. Plaintiff's support for this further assertion is an email on February 10, 2010, from CBRE to a prospective offeror inquiring whether it would be submitting an initial offer for "the 750,000 sf *requirement*." AR 516 (emphasis added). Plaintiff also cites a letter dated April 23, 2010, from GSA to Vornado/Charles E. Smith Co. in which reference was made to the "*requirement* for approximately 750,791 rentable square feet" of office and related space. AR 517 (emphasis added). The purpose of the letter was to advise Vornado that its proposed full occupancy date of December 2012 did not meet either the June 2011 deadline "*requirement*" for 600,000 square feet or the September 2011 "for the remainder of the 750,791 square feet as outlined in Section 1.9 of the SFO." *Id.* (emphasis added).

In fact, GBA's final proposal, inclusive of an option for 82,710 rsf of space it offered to build onto its existing building, was for 750,995 rsf. AR 2690, 2693. Its offer thus exceeded the "approximately 750,791" rsf specified in the SFO. Including the additional offer-to-build space, GBA's proposal offered 716,536 usf; without the additional space, GBA's offer yielded 644,001 usf (644,244 usf as measured by CBRE). AR 2690. By either measure, its usf exceeded the 625,659 called for in the amended SFO. There is no assertion that GBA's offer failed to meet the requisite ANSI/BOMA or usable square footage space.

Without the additional space, however, GBA's offer was only for 668,285 rsf (667,682 by CBRE's measure), approximately 82,000 square feet short of what Plaintiff argues is a mandatory minimum of rsf. *Id.* GSA was subsequently advised by MedCom that it did not need the extra rentable square footage, given that the usable square footage offered more than met its usable square footage needs. AR 2693. GSA accepted GBA's proposal without the additional rsf space and awarded the lease based on the 668,285 rsf.[11] AR 2707. Accordingly, if the SFO can fairly be construed as requiring a minimum offer of 750,791 rsf, then Plaintiff has a valid complaint.

There are plentiful references in the AR to GSA's characterization of the rsf amount of 750,791 as "required" or as a "requirement." For example, in a letter dated April 23, 2010, soliciting GBA's Final Proposal Revision (FPR), GSA requested that GBA "[i]ndicate how you would deliver more space to meet the minimum usable *and rentable* square footage requirements as outlined in the SFO." AR 2682 (emphasis added). In the "Scaling of Offered Space Contractor Statement" regarding GBA's final proposal, AR 2680, there is an "additional comment" noting, "GSA to determine if the RSF and USF offered can meet the requirements of the Agency given it is below the SFO amount requested. Note that the Offeror has offered an option that provides the rentable square footage requested." These remarks clearly imply that GSA would need to examine more closely GBA's rsf offer without the option of building

---

[11] Thus, it is inconsequential that GBA's offer *with* the option of building additional space exceeded the 750,791 rsf requested in the SFO. As Plaintiff pointed out in oral argument, "How can you say that's the basis for a compliant award when the government rejected it?" Tr. 125:4-5 (Pl.).

11

additional space. Even SFO Amendment Number Two, in a question-and-answer format clarifying issues raised in response to the original SFO, refers to "rentable square feet" as an "overall requirement." AR 312. GSA's letter to EREH soliciting its FPR likewise requested that it confirm how it could meet "the usable and rentable square footage requirement as outlined in the SFO." AR 1597.

Plaintiff further argues that it was prejudiced by GSA's arbitrary "waiver" of GBA's obligation to meet the minimum rsf requirement in the calculation of the total lease price.

Per SFO ¶ 2.1, the award was to be made to the "responsible Offeror whose offer conforms to the requirements of this SFO and is the lowest priced offer submitted." AR 177. The methodology of the price evaluation of competing offers is laid out in ¶ 2.6 of the SFO. AR 179-80. The offeror was required to demonstrate that its proposed rentable space would yield ANSI/BOMA Office Area space "within the required ANSI/BOMA Office Area range." ¶ 2.6 B; AR 180. The Government would verify the ANSI/BOMA square footage and "convert the rentable prices offered to ANSI/BOMA Area prices, which will subsequently be used in the price evaluation." *Id.* On the basis of the two competing offers, GSA made the award to GBA because its price, in the form of a "10 Year Firm Term NPV," was the lowest: $27.59, as compared to that of Plaintiff, which was calculated to be $32.16. AR 2707.

Plaintiff reasons that the amount of rsf is significant because "the rental price is based on the rental square footage, not the useable square footage." Pl.'s Resp. 20. The Government replies that "usable square footage was the basis upon which GSA would compare offeror's prices," Def.'s Reply 10, and that Plaintiff's contention, i.e., rental price based on rental square footage, is clearly contradicted by the "framework for price evaluation described in the solicitation." *Id.* at 11. Even at oral argument, Defendant maintained that "the size of the space doesn't affect" the price per usable square foot. Tr. 129:3-6 (Def.). In the court's view, the parties' arguments in this regard are like ships passing in the night.

Defendant is correct that, under the SFO, the measure of comparison between offerors is the lease price per usable square foot, but that unit price itself is determined by "converting," i.e., dividing, an offeror's overall rental price by the number of usable square feet. If one offeror's overall rental price reflects costs driven up by providing a greater amount of rsf, even though hypothetically the amount of usf is the same as that of a competitor, then the first offeror's price per usf will be higher. In that respect, Defendant is incorrect in asserting that the size of the space doesn't affect price per usf. Thus, Plaintiff's argument is potentially relevant when it states that, had it known that it could have offered less than 750,791 rsf, it "could have submitted a proposal for less space which would have resulted in a significantly lower total lease price." *See* Pl.'s Resp., Exh. 1, Declaration of Arthur C. Frye ("Frye Decl."), at 2, ¶ 6.

Plaintiff's argument here is only potentially relevant because it is founded on a reading of the SFO in which the 750,791 rsf is construed as a mandatory minimum requirement. As GBA points out, the fatal flaw in Plaintiff's argument is that it "reads the term 'approximately' out of the RFP." Intervenor's Reply 12. "As reflected by the use of the term 'approximately,' the Solicitation called for a range, not a precise amount, of space." *Id.* at 13. The court concurs. Although the SFO does not define either "approximately" as used in ¶¶ 1.1 A. and 1.9 or "range"

as used in ¶¶ 1.1 C. and 2.6 B., the court finds that GBA's offer of 668,285 rsf is within 11% of the "approximately 750,791" rsf specified. The various references by GSA in letters, email correspondence, etc., referring to the amount of rsf as a "requirement" do not inherently amend the SFO itself or otherwise constitute a binding mandatory minimum of rsf. The SFO remains the operative and governing document of the conditions of the solicitation. The court does not read the SFO itself as mandating the provision of "at least" 750,791 rsf, but rather "approximately" 750,791 rsf.

Accordingly, the court does not find that GSA acted arbitrarily or capriciously in finding that GBA's offer was acceptable even without its building the additional 82,000 rsf of space.

V. Occupancy Schedule

Plaintiff's third complaint against GSA's award of the lease to GBA is that GBA's schedule for meeting required construction and occupancy deadlines was not in compliance with the SFO.

The court finds that much of Plaintiff's complaint in this respect amounts to, as Defendant characterizes it, "mere disagreements with," or second-guessing, "the technical judgment of the contracting officer." Def.'s Cross-Mot. 22. For example, Plaintiff avers generally that "it was not reasonably possible for GBA to meet the deadlines, given the continued occupancy of the building [by current tenant Raytheon] and the significant work that needs to be done to meet the shell building and government mandated security requirements." *Id.* at 35. Yet contracting officers are "entitled to exercise discretion upon a broad range of issues confronting them" in procurement matters. *Impresa*, 238 F.3d at 1332 (quoting *Latecoere Int'l, Inc. v. United States Dept. of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994). Plaintiff also argues that, contrary to seven specific "SFO task milestones, which are sequential, GBA's schedule provides for these tasks to be performed concurrently." Pl.'s Mot for J. 40. Defendant denies that these tasks are necessarily sequential in nature. Moreover, in ¶ 3.5 A. 7., the SFO provides that, "The decision on Offeror's capability to perform and deliver prior Occupancy Date shall be in the Contracting Officer's sole discretion." AR 248.

More credibly, however, Plaintiff takes issue with GBA's facial compliance with certain objective occupancy deadlines set out in the SFO. The argument here centers on the proper interpretation of ¶ 1.9 of the SFO, entitled "Occupancy Date," in conjunction with Amendment Two regarding "phased occupancy" of the space. Paragraph 1.9 provides,

> Approximately 600,000 rentable square feet must be ready for the commencement of the Government's move in no later than June 1, 2011. In order to meet the Base Realignment and Closure (BRAC) statutory deadline of September 15, 2011, full occupancy for this first phase is required no later than September 1, 2011. The remainder of the 750,791 rentable square feet must be ready for the commencement of the Government's move in no later than June 1, 2012, so full occupancy can occur no later than September 15, 2012. After each phase of space is occupied, an occupancy date

>    shall be established that will be calculated based on the composite
>    of the phased occupancy dates.

AR 237.

Thus, the SFO plan established two phases for the Offeror's obligation to make the space ready for Government occupancy. In the first phase, the lion's share of the requisite space had to be ready by June 1, 2011, in order that MedCom had time to move in to meet its BRAC deadline of September 15, 2011; similarly, in the second phase, the Offeror had to have the balance of the space ready for occupancy by June 1, 2012, so that the balance of the move-in could be completed by September 15, 2012.

Amendment Two to the SFO answered a question from prospective Offerors as to whether GSA could offer any flexibility regarding occupancy deadlines. The answer was no. AR 312. In the answer, GSA also stated that the Government's actual occupancy of the space in the first phase above would not necessarily take place all at once on June 1, 2011, but would be spread through the period between June 1 and September of that year ("The phased occupancy for this portion should occur between June 1 and September 1, 2011."). *Id.* The court does not find that the phrase "phased occupancy" in this portion of Amendment Two, made any change in the obligation of the Offeror to have *all* of the first amount of space "ready" for Government occupancy by June 1, 2011, even if MedCom would be moving in incrementally throughout that summer.

Yet, Plaintiff points out, "[t]he GBA schedule includes dates for accomplishing tasks required by the SFO that on their face will be completed after the June 1, 2011 move-in date or otherwise fail to meet the SFO requirements." AR 3285-89. For example, the activity described as "Final Inspection / C[ertificate] of O[ccupancy] Phase 1," lists a start date of June 16, 2011, and a finish date of September 1, 2011. Under the SFO, ¶ 5.13 G., the Lessor is obligated to "provide a Certificate of Occupancy, issued by the local jurisdiction." AR 2933. Because the Certificate of Occupancy is required before the Government could occupy the space, it seems evident that GBA's schedule on its face does not accommodate the June 1, 2011, requirement for occupancy readiness.

In addition, the same paragraph of the SFO provides, "Thirty (30) days prior to the completion of interior construction for each phase, the Lessor shall issue written notice to the Government to inspect the space. The Government shall have twenty (20) working days to inspect and to either accept or reject the subject space." *Id.* The paragraph further provides, "Substantially completed space will be accepted by the Government subject to the completion of minor punch items (see the Definitions paragraph of GSA Form 3517, General Clauses). Space which is not substantially complete will not be accepted by the Government." Based on the June 1, 2011, date for "occupancy readiness," Plaintiff construes this 30-day advance notice requirement as effectively establishing a May 2, 2011, date for substantial completion of the space. Pl.'s Mot. for J. on AR 41. "[T]he SFO required Notice of Inspection at least 30 days prior to June 1, 2011 – meaning that the space must be substantially complete at least 30 days prior to June 1, 2011, including the Certificate of Occupancy, to allow for Government inspection." Pl.'s Resp. 16.

14

Thus, Plaintiff itemizes a substantial list of construction items for which the finish date, per GBA's final offer, falls after May 2, 2011 (although most of the finish dates are prior to June 1). Pl.'s Mot. for J. 41-42.

GBA accurately notes in response, however, that the notice provision in question requires that the Lessor give notice to the Government 30 days *prior to* "completion of interior construction."[12] AR 2933. "By definition, the notice is to be given before the work is finished." Intervenor's Cross-Mot. 25. A precise reading of this paragraph in the SFO establishes that the Lessor is still allowed 30 days subsequent to the date of the notice (or June 1, 2011, whichever comes first) in which to substantially complete the space for occupancy. Therefore, tasks on GBA's schedule that show a "finish" date between May 2, 2011, and June 1, 2011, are not out of compliance with the SFO, contrary to Plaintiff's protest.[13]

Furthermore, even as to the portions of GBA's proposed schedule that show a finish date after June 1, 2011, Plaintiff overlooks the "Progressive Occupancy" provision of the SFO. In ¶ 13 of Form 3517B, entitled "General Clauses (Acquisition of Leasehold Interests in Real Property)", and incorporated into the Solicitation, the Government reserved the right to elect to occupy the space in partial increments. This provision, unlike Amendment Two, not only refers to "Government occupancy," but also specifically allows a relaxation of the otherwise requisite June 1, 2011, deadline for the Lessor's performance regarding occupancy readiness. It reads, in relevant part, "The Government shall have the right to elect to occupy the space in partial increments prior to the substantial completion of the entire leased premises, and the Lessor agrees to schedule its work so as to deliver the space incrementally as elected by the Government." AR 400, 3010. Moreover, both Plaintiff and GBA were advised in the February 23, 2010, negotiation meetings that GSA may modify the initial June occupancy date. AR 2702, 2704.

The Government in fact exercised this right in the July 12, 2010, executed lease with GBA: "Substantial completion shall occur in four (4) phases: approximately 200,000 RSF by June 1, 2011, 200,000 RSF by July 1, 2011, 118,285 RSF by August 1, 2011, and 150,000 RSF by June 1, 2012." AR 2843.

Accordingly, the court finds no violation of the SFO in GSA's acceptance of GBA's schedule for the delivery of space.

---

[12] The phrase, "completion of interior construction," is not defined in the SFO, but in the context of this paragraph in the SFO, the court finds that it equates to "substantial completion." "Substantial completion," in turn, is defined in the Definitions paragraph of GSA Form 3517 as meaning that "the work, the common and other areas of the building, and all other things necessary for the Government's access to the premises and occupancy, possession, use and enjoyment thereof, as provided in this lease, have been completed or obtained," with the exception of minor punch list items.

[13] It is perplexing to the court why GSA would word its SFO in this manner, because the Government is put in the position of having to accept or reject space which is perhaps mostly but necessarily completely finished. As Plaintiff notes, "It is illogical that the Government would want to inspect prior to substantial completion." Pl.'s Resp. 16 n.12. Yet that is what the SFO provides.

VI.     Prejudice to Plaintiff and Criteria for Injunctive Relief

Having determined that Plaintiff has succeeded on the merits with respect to GSA's acceptance of GBA's proposal in violation of the SFO flood plain prohibition, the court must determine whether Plaintiff was prejudiced by that error, that is, it must weigh whether "there was a substantial chance [EREH] would have received the contract award but for that error." *Statistica*, 102 F.3d at 1582. The "substantial chance" test "is more lenient than showing actual causation," *Bannum*, 404 F.3d at 1258, but still requires a "harm specific to the asserted error." *Labatt*, 577 F.3d at 1381.

Here, EREH was the only other final offeror. Had GSA made a proper determination that the GBA property and some of the appurtenances in its offer were located in the Holmes Run flood plain, it would have been obligated per the GSA Desk Guide to identify and evaluate whether EREH offered a "practicable alternative." *See* AR 3822. Defendant has acknowledged, however, that GSA did not ever make such a determination. Tr. 13:5-18 (Def.), Hearing on Pl.'s Compl. for Relief, August 20, 2010.

Nevertheless, Defendant and GBA argue that Plaintiff's offer was itself non-compliant in material respects such that it would not have and could not have received an award of the contract and therefore cannot establish prejudice. For instance, on February 23, 2010, GSA and CBRE met with Plaintiff, as they did with GBA and Vornado, to discuss the initial offers. At that meeting, Plaintiff was advised that its "proposed edits to the SFO and General Clauses are not acceptable" and that there were three "potentially non-compliant components of their offer." AR 2704. These were: "The offered rental rate was net of utilities; The operating expense escalators were to be actual, not in accordance with CPI, as outlined in the SFO; [and] The proposed real estate tax base was a stop, not based on the first year of full assessment." *Id.*

On April 23, 2010, in a letter requesting Plaintiff's Final Proposal Revision (FPR) to be submitted as of May 6, 2010, GSA listed "remaining issues that need to be clarified or resolved." AR 1597. Among these were that EREH's "Proposed modifications to the SFO are unacceptable and will not be considered. Any attempt to further modify the SFO may result in your offer being considered non-responsive, and as a result, will not be considered for award." *Id.* More specifically, GSA advised that, as to Form 1364, "A rental number should be inclusive of utilities and real estate taxes," *id.*; as to Form 1217, "Lease should be inclusive of utility costs and real estate taxes," AR 1599; and that "Modifications to GSA Form 3517B are unacceptable." AR 1599. GSA asked that "[y]our FPR shall include all corrections noted within this letter." *Id.*

In a one-page summary, dated May 6, 2010, apparently analyzing Plaintiff's final offer, the following is noted in the AR with regard to GSA Form 1217: "Offer is net of electricity (Non-Compliant)." The same document also recites: "Government is to pay all actual increases in operating expenses and real estate taxes, instead of per SFO (Non-Compliant); . . . All electric costs are paid directly by Government (Non-Compliant); . . . [and] "A 6" bulkhead will need to be added to each floor to accommodate progressive collapse requirements (could cause ceiling height to be Non-Compliant) . . ." AR 2252.

16

In its more comprehensive Price Negotiation Memorandum, dated May 24, 2010, the GSA Contracting Officer, the GSA Realty Specialty, and the CBRE representative concluded that, while GBA's offer was fully compliant, the EREH offer "had some remaining issues." AR 2706. In reciting the several areas of the EREH offer that "*could be* considered non-compliant," the memorandum repeats verbatim the itemization in the notes from the post-initial offer meeting with EREH held on February 23, 2010. *Id.* (emphasis added).

The court is not convinced that GSA formally found the EREH offer to be non-compliant. Despite the parenthetical notation to that effect in the May 6, 2010, one-page summary, the tentativeness of the observations in the more complete May 23, 2010, memorandum suggests the possibility that there would have been some leeway available in further negotiations between GSA and EREH to resolve any uncertainties, had such discussions been necessary. Plaintiff avers that its final offer had deleted any non-compliant language in its initial offer regarding the CPI (Consumer Price Index) provision relating to increases in operating expenses, that its offer was net of electric pursuant to ¶ 4.8 of the SFO ("the offeror shall specify which utilities, if any, are excluded from rental consideration."), and that its real estate and BID (Business Improvement District) language merely clarified that the Government's assessment would be limited to the portion of the property actually to be occupied by MedCom ("because eventually the property would include other space with other occupants"). AR 1679, 1683; Pl.'s Resp. 23.

The court lacks the expertise to determine whether these issues constituted definitive and material non-compliance with the SFO. Ultimately they relate to the cost to the Government of accepting EREH's offer rather than to the requisite square footage, occupancy readiness, and anti-terrorism standards fundamental to the MedCom BRAC relocation. If GBA's offer had been eliminated from consideration because of the flood plain restriction or, rather than eliminated, had faced the prospect of the much more time-consuming process of the full eight steps prescribed in the GSA Desk Guide, the EREH offer might very well have had a substantial chance of contract award given the statutory time-constraints of the September 15, 2011, BRAC deadline. Accordingly, the court finds that EREH's protest has met the prejudice burden for further consideration of relief in this action.

In consideration of injunctive relief, however, the court must also consider three additional factors: 1) whether the plaintiff would suffer irreparable harm without such relief, 2) the balance of hardship to the respective parties, and 3) the interest of the public. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004). "No one factor, taken individually, is necessarily dispositive. *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993).

The relevant inquiry in assessing the factor of irreparable injury is whether the plaintiff has an adequate remedy in the absence of injunctive relief. *See Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1327 (Fed. Cir. 2008) (reviewing district court's analysis of irreparable injury and lack of adequate remedy at law factors in connection with each other); *see also Crassociates, Inc. v. United States*, -- Fed. Cl. -- , 2010 WL 4162118, at *28, Oct. 20, 2010 (No. 10-339 C). In the absence of injunctive relief, the only remedy available at law to Plaintiff would be "damages in the amount of bid preparation costs." *Magnavox Elec. Sys. Co. v. United States*, 26 Cl. Ct. 1373, 1379 (1992). Plaintiff maintains, credibly, that it purchased its property "over six years

ago with a specific strategy of repositioning this asset for federal tenants" subject to anti-terrorism building and site security requirements. Pl.'s Mot. for J. 49. It argues that the MedCom headquarters is representative of its targeted tenant profile and "is one of the last BRAC agencies of this magnitude to have a lease relocation requirement in this marketplace." *Id.* Plaintiff's recovery of bid preparation costs, instead of the benefit of competing on a level playing field for the MedCom lease, qualifies as irreparable injury. *See United Int'l Investigative Servs.*, 41 Fed. Cl. 312, 323 (1998) ("[T]he opportunity to compete for a contract and secure any resulting profit has been recognized to constitute significant harm."). In addition, Plaintiff relates that its building's construction loan will be expiring in the fall of 2011. "This will result in the majority of existing debt having to be replaced with equity as loan proceeds will be substantially reduced without the source of rental income." Pl.'s Resp. 50; Frye Decl. ¶ 7. The court finds that Plaintiff would suffer irreparable harm from the award of the lease to GBA.

There is no doubt that GBA would suffer harm if the contract were set aside or delayed. Certainly it would lose the economic benefit of the lease. In addition, in light of the fact that the lease lacks a termination for convenience clause, both GBA and GSA would need to resolve what Defendant has described as "significant negotiated contract termination damages." Def.'s Reply 32. GSA would have the option of determining, perhaps somewhat hastily, whether the EREH offer was (or is) materially compliant and thus whether it is the "practicable alternative" to the GBA offer. In that respect, there is a likelihood that even more time would be lost re-examining whether EREH itself could still meet the BRAC deadline of September 2011. Otherwise, GSA would possibly have to return to the drawing board in re-advertising the lease. Were it not for the BRAC deadline, the court would find the balance of harm among the parties to be essentially a draw.

The interest of the public, however, tips the balance in favor of preserving the status quo. Plaintiff properly notes the value of "preserving the integrity of the procurement process and promoting competition for government contracts . . . ." *Magnavox*, 26 Cl. Ct. at 1385. In addition, it cites the public's interest in avoiding the risks of development in flood zones and of preserving the natural and beneficial environmental values of flood plains. Yet the flood plain problem is eminently curable by an agreement between GBA and GSA to relocate the offending parking spaces as well as the transfer station and perimeter fencing to another side of the building away from the Holmes Run flood plain. In the SFO, the Government specifically reserved the right to implement all security requirements, including public access, truck shipments, and surface parking. AR 221-24. More compelling is the fiscal and security interest of adhering to the BRAC timetable and avoiding the welter that would be caused if the various MedCom units could not move in time to one central location in the region.

Defendant submitted a declaration of Dr. Dorothy Robyn, Deputy Under Secretary of Defense ("Robyn Decl."), with its cross motion for judgment on the record. Dr. Robyn advised that "the government will incur extra costs for extending multiple current leases at premium rental rates until the MedCom HQs is ready for occupancy." Robyn Decl. at ¶ 6. She also noted that BRAC funding to implement the MedCom move would no longer be available after September 15, 2011. Other federal agencies planning to move into space vacated by the existing MedCom units would also be disrupted. In addition, certain MedCom personnel would be forced to remain in space that does not necessarily meet anti-terrorism standards. Also, savings

projected from the re-location of currently scattered MedCom units would not then be available for other, higher priority Department of Defense purposes.

Regrettably, in light of the prejudice to Plaintiff from the unfounded determination of GSA that the GBA property was not located within a flood plain, the court finds that the interest of the public trumps the other considerations for injunctive relief in this unique, time-sensitive procurement.

VII. Conclusion

For the reasons stated above, Plaintiff's Motion for Judgment on the Administrative Record is DENIED and the Cross Motions of Defendant and Intervenor for Judgment on the Administrative Record are GRANTED.

In addition, however, because Plaintiff has prevailed on the merits, despite the court's decision not to grant injunctive relief, Plaintiff is hereby awarded its bid preparation costs.[14]

Accordingly, it is hereby ORDERED:

1) On or before December 3, 2010, Plaintiff shall submit to the Government itemized and supportive evidence of the bid preparation costs it asserts. Defendant shall have 30 days within which to review Plaintiff's submission and to request additional information. On or before January 7, 2011, the parties shall file a Joint Status Report suggesting further proceedings in this regard and a proposed schedule therefore.

2) Entry of Judgment is deferred pending the court's final determination of Plaintiff's bid preparation costs.

s/ Edward J. Damich
EDWARD J. DAMICH
Judge

---

[14] *See Red River Holdings, LLC v. United States*, 87 Fed. Cl. 768, 792 (2009) ("The Federal Circuit emphasized that 'the language of 28 U.S.C. § 1491(b)(2) . . . provides the Court of Federal Claims with discretion in fashioning relief.'" (citing *PGBA*, 389 F.3d at 1226)). The court here construes Plaintiff's prayer for relief in its Motion for Judgment on the Administrative Record as encompassing the relief requested in its initial complaint ("such further relief as the Court may deem just and proper.").